Angelo CARVITTO and Ray Kirkpatrick
d/b/a Carvitto and Kirkpatrick,
Respondents,

v.

Walter H. RYLE, Jr., Appellant.

No. 25850.

Missouri Court of Appeals,
Kansas City District.

May 3, 1973.

Jayne, Oswald & Cottey, Kirksville, for appellant.

None, for respondents.

Before SWOFFORD, P. J., SHANGLER, and WASSERSTROM, JJ., and SCHOENLAUB, Special Judge.

SWOFFORD, Judge.

This is an appeal from a money judgment entered upon a jury verdict in favor of the plaintiffs-respondents and against the defendant-appellant, based upon plaintiffs' claim for labor and material furnished by them in the construction of driveway-curbings, stoops and other cement work in connection with a new home of the defendant.

Counsel who represented plaintiffs in the trial below and in the early stages of this appeal was permitted by this court to withdraw for good cause. Although plaintiffs were given due notice of this withdrawal and ample opportunity to employ other counsel, they did not do so and no brief was filed on their behalf. The cause was submitted without argument on appellant's brief. We have given concentrated study to the record before us and the applicable law and will rule the case in its present posture.

The plaintiffs were partners engaged in the cement finishing and contracting business at Kirksville, Missouri. The defendant was a professor at the Northeast Missouri State College at Kirksville.

In early 1968, a representative of Schultz Homes, a dealer in "packaged homes" called upon the defendant and his wife. His name was Dale Scott and the record shows that he was also an officer in a Kansas corporation known as "Cunningham and Associates" with its place of business in Kansas City, Kansas. The president and principal manager of this corporation was one Hollis Cunningham. The Schultz company apparently dealt in the sale of packaged or prefabricated homes. General contractors, such as Cunningham, were available to build such homes in various areas and in turn, sub-contracted various parts of such construction to local workers or contractors.

The end result of Dale Scott's contacts with the defendant was that the Ryles entered into a written contract with Cunningham and Associates to construct a Schultz home for him at Kirksville for $33,000.00.

In May of 1969, the defendant inquired of the plaintiffs if they would be interested in estimating or bidding on the outside cement work "he needed done" for his home. They prepared their estimate and bid, based upon a cost per unit of lineal and square foot, depending on the type of work.

The plaintiffs testified they showed these figures to defendant, he approved them, and then told them to contact Cunningham in Kansas. They further said this was the first time they had heard of Cunningham. Ryle, the defendant, testified that he contacted them at the request of Cunningham and that he never saw their figures or approved them. In any event, plaintiff Kirkpatrick contacted Cunningham by telephone and mailed him a copy of the bid and, again on the telephone, Cunningham accepted and told them to go to work.

On a day in May, 1969, they moved their concrete forms and other equipment to the defendant's home site. The next day, they started work and after a few hours (still in the forenoon) one Schneider, who also had done some subcontracting work on the Ryles' home, including the excavation for the foundation, came by and asked them (in a manner described as "jokingly") if they knew "what they were doing?". In the course of this conversation with Schneider, he told plaintiffs that he had received a bad check from Cunningham and was having trouble collecting from him. Schneider, a witness for plaintiffs, substantially confirms this.

After Schneider's departure, the plaintiffs, fearful as to the source of their pay, decided to "pull off" the job and quit work on it—at least until they talked with the defendant. Later that morning (still before noon) the defendant came by and engaged in conversation with the plaintiffs.

According to plaintiffs, this conversation consisted in the plaintiffs telling Ryle that they were apprehensive about collecting from Cunningham and had decided to "pull off" the job (and not complete it). Ryle said "You boys don't do that. I'll see that you get your money." Ryle asked them to finish this job.

Both the plaintiffs testified that as a result of this conversation with the defendant, they understood that if Cunningham did not pay them, Ryle would do so, and that they, therefore, continued and completed the work. Photographs of the Ryle home indicate that it was constructed on open land, upon rather high ground, and would be inaccessible without the gravel driveway which was retained by the curbing construction done by plaintiffs.

Upon completion of the work, the plaintiffs billed Cunningham on about three (3) occasions and contacted him by telephone. Cunningham never paid anything on the bill. Plaintiff Kirkpatrick then contacted defendant Ryle about payment of the bill about 4 to 6 weeks after the job was completed. He attempted to secure payment from defendant frequently thereafter, but without success.

Defendant Ryle made direct payments on his $33,000 contract to Schultz Homes, to Cunningham and from time to time to others, when requested to do so by Cunningham. He testified, however, that he withheld $3,000.00 of the contract price to be sure that materialmen and laborers in the community were paid and to protect against liens. However, he testified that he ended up paying more than $33,000.00 total, including payment to Cunningham for the cement work done by the plaintiffs. He stated that he talked to Cunningham many times in attempts to get him to pay plaintiffs. Ryle denied that he had ever agreed to pay the plaintiffs directly or if Cunningham failed to do so.

Both plaintiffs testified on cross examination that the defendant did not "promise" to pay them himself. Both characterize the defendant's stated position "that he would see that we got our money", "I'll see that you get your money for it, don't worry about it". One electrical subcontractor, Lester Bowers, testified for plaintiffs that the defendant had made the same assurances to him.

Hollis Cunningham, the general contractor, testified as a defense witness by deposition and admitted the arrangements for the cement work with plaintiffs, that he had received the money from Ryle, but had not paid plaintiffs, although Ryle had asked him to pay their bill. He stated that Ryle had referred the plaintiffs to him and that Ryle approved of them working on his home. He testified that Ryle was in frequent contact with the subcontractors as the work progressed.

There is no dispute in the record as to the quality of the work or the material furnished by the plaintiffs, nor as to the reasonable value thereof.

We are urged by appellant to reverse the judgment upon several grounds. *First,* he asserts that his motion for a directed verdict at the close of all the evidence and his motion for a new trial should have been sustained because there was no substantial evidence of an express oral contract; that the claimed "judicial admissions" of plaintiffs that the defendant did not "promise" to pay them affirmatively proved there was no contract; that the testimony of plaintiffs as to their "understanding" of their agreement with defendant was inadmissible and that no valuable consideration was shown for the oral contract. *Second,* that the oral contract was void under the Statute of Frauds, Section 432.010 RSMo 1969, V.A.M.S. *Third,* the court erred in giving Instruction No. 3. *Fourth,* the court erred in giving Instruction No. 4. *Fifth,* the court erred in giving Instruction No. 1. *Sixth,* that even if no single error contained in any of these points, standing alone, requires reversal, their cumulative effect requires this court to do so.

We have carefully considered each of these claims singly and collectively, and appellant's authorities cited in support thereof, and other authorities, and have concluded that no error requiring a reversal appears and that the judgment should be affirmed.

In reviewing this record as to whether or not the defendant's motion for a directed verdict should have been sustained, we again recognize the sound rule that the trial court should not resort to such drastic action unless the facts in evidence and all reasonable inferences to be drawn therefrom "are so strongly against plaintiff as to leave no room for reasonable minds to differ". De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628 (en banc 1953). In this matter, there is a drastic conflict between the parties as to the conversation and understanding in May. The issue of credibility was one for the jury.

Accepting the plaintiffs' version (as did the jury), we find a subcontractor about to shut down a job which was obviously an important and vital part of the over-all project and an integral, necessary factor for the owner's use. They were fearful, indeed confident, that they would not be paid by the general contractor with whom

they had been placed in contact by the owner and who was an unknown, non-resident and to them a suspect person. On the strength of owner Ryle's plea "Don't do that, boys", and his assurance "I'll see that you get your money" and "Don't worry about it", they continued and completed their job.

■ This arrangement contained all of the necessary elements of a simple contract, including consideration as so basically defined in Charles F. Curry & Co. v. Hedrick, 378 S.W.2d 522 (Mo.1964) where it was said, 1. c. 533:

"There are various definitions of 'consideration' as applied to simple contracts. A valuable consideration 'may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, loss or responsibility given, suffered or undertaken by the other.'"

■ Neither was it unenforceable as indefinite or vague. The plaintiffs were to finish the job and defendant would see that they got their money. Shofler v. Jordan, 284 S.W.2d 612, 613 (Mo.App.1955). In reviewing this area, we must "take language as it is and people as they are". 1 Corbin on Contracts, Sec. 95, p. 396.

■ But the main thrust of appellant's position seems to be that under skillful and persistent cross examination by defense counsel, both plaintiffs stated that the defendant did not "promise" to pay them "himself". Appellant states that this amounted to judicial admissions, as a matter of law, requiring a directed verdict. We do not agree. Rather, we adopt the view of the learned trial judge that these plaintiffs were working men, unlearned and unsophisticated in the legal implications of the word "promise" as applied to contracts, nor of the legal considerations implicit in the use of such term. These were not "true" admissions in the sense of any "formal act done in the course of judicial proceedings which waives or dispenses with the production of evidence" nor any concession that any proposition of fact alleged by defendant was true. Maltz v. Jackoway-Katz Cap. Co., 336 Mo. 1000, 82 S.W.2d 909, 917 (1935). At most, such were "quasi admissions"—items of evidence—for consideration of the jury and affecting credibility only.

See also: Stockton v. Tester, 273 S.W. 2d 783, 786 (Mo.App.1954); Leek v. Dillard, 304 S.W.2d 60, 67 (Mo.App.1957); Campbell v. Evens and Howard Sewer Pipe Co., 286 S.W.2d 399 (Mo.App.1956).

■ If defendant had enjoyed during trial the apparently firm conviction he now asserts, that such "admissions" were conclusive of all issues, as a matter of law, he should not have introduced evidence. By so doing, he relieved the plaintiffs of any alleged binding effect of such admissions. By making a clear choice not to do so, he made the issue one of fact for the jury. 31A C.J.S. Evidence § 381, p. 920, et seq.

In Plemmons v. Pevely Dairy Co., 241 Mo.App. 659, 233 S.W.2d 426 (1950), the court said, 1. c. 434:

"It is a well established principle of law that where a party does not rely upon a judicial admission of his adversary, but introduces evidence which has the effect of disproving his case, the party making the admission is not bound by his admission."

■ Appellant also complains of the action of the trial court in permitting the plaintiffs, over objection, to testify as to their "understanding" of the agreement reached with Ryle in the on-the-job conversation in May. He states that such testimony constituted inadmissible opinions and conclusions. We do not agree.

The testimony complained of is:

"Q. (Redirect) Angelo (Carvitto), what was your understanding as to who would pay you if Mr. Cunningham didn't pay you?

\*　　\*　　\*　　\*　　\*　　\*

A. My understanding, the way I believe. Well, I believed if Mr. Cunningham didn't pay it that Mr. Ryle would."

Mr. Kirkpatrick on direct examination testified:

"Q. In the event Mr. Cunningham hadn't paid you, what was your understanding as to who would pay you?

\* \* \* \* \* \*

A. It was my opinion he would pay it if Mr. Cunningham didn't, the way I got it."

■ We are aware of the general rule, that a witness ordinarily cannot testify as to his "understanding" of a matter. 32 C.J.S. Evidence § 451, p. 89. We are also aware of the recognized exception to this rule, that permits such testimony where facts can be presented in no other way or where motive, intention or belief of a person is in issue. 32 C.J.S. Evidence § 451, p. 90; Jones, Treatise on Evidence (6th Edition, 1972), Vol. 1, Sec. 4.55. We agree with the trial judge that in the case before us, the understanding of the plaintiffs has an independent relevance, bearing upon the meeting of the minds in the oral contract and the intent, motive or belief of the parties which led to the completion of the work.

Appellant next asserts that the contract sued upon is void because it is within the Statute of Frauds, Section 432.010 RSMo 1969, which provides in pertinent part as follows:

"No action shall be brought \* \* \* to charge any person upon any special promise to answer for the debt, default or. miscarriage of another person \* \* \* unless the agreement \* \* \* shall be in writing \* \* \*"

■ There are compelling legal reasons why this position of defendant cannot be upheld. The basic rule as to whether a

promise falls within this section of the Statute of Frauds and is therefore void and unenforceable, lies in the determination of whether the promise is original or collateral. If it is original, it is enforceable. If it is merely collateral, it is not enforceable. Sale v. Brown, 396 S.W.2d 750 (Mo.App.1965); 37 C.J.S. Statute of Frauds § 16, p. 522.

The tests to be applied as to whether the promise is an original undertaking or not are set forth in Diehr v. Carey, 238 Mo. App. 889, 191 S.W.2d 296 (1945), where the court said at l. c. 300:

"\* \* \* the tests to be applied to determine whether an agreement is an original undertaking, and not within the statute of frauds, are laid down as follows: (1) Credit must be given by the promisee to the promisor alone; and (2) the leading or main purpose of the promisor in making the promise must be to gain some advantage for himself, rather than to become the mere guarantor or surety of another's debt, and the promise must be supported by a consideration beneficial to the promisor."

■ The fact that such promise may in form be a promise to pay another's debt or that it might be incidentally beneficial to another debtor does not alone bring it within the statute of frauds. If the "leading" or "main" object of the promise is not to answer for the debt or obligation but rather to serve an interest of the promisor or if it directly benefits him, the promise is not within the statute. Sale v. Brown, supra; Ryan Equipment Co. v. Ficken, 423 S.W.2d 63, 72 (Mo.App.1967); Moore v. McHaney, 191 Mo.App. 686, 178 S.W. 258, 261 (1915); Yeoman v. Mueller, 33 Mo. App. 343 (1889); Mertens v. McMahon, 334 Mo. 175, 66 S.W.2d 127, 137 (1933).

■ The evidence before us is clearly indicative of the fact that the leading and main object of Ryle's promise to plaintiffs that he would see that they were paid was in his own interest. The defendant was in

the midst of a substantial home building project with a general contractor, Cunningham, who lived in Kansas, was apparently rarely on the job site, and who had already paid one of the subcontractors with a worthless check. The plaintiffs having just started on the work were about to stop work and quit the job; the work assigned to them was vital to the defendant's use and preservation of the property, and he had retained $3000.00 from the contract price to cover payment for material and local labor and to avoid liens. It was certainly of great personal interest to him that the work be completed.

As for the plaintiffs, the evidence is convincing that they were agreed to leave the job and do no further work on it until they received the assurance and promise of the defendant. Based upon this promise, they did complete the job using their own material and labor, filed no statutory lien against the property, and have never received payment.

For these reasons, we hold that plaintiffs' claim was not barred by the statute of frauds.

Finally, we come to the defendant's claimed errors in the instructions given by the court below. What we have said above disposes of his objection to Instruction No. 3, which was plaintiffs' main verdict directing instruction and which hypothesizes all necessary facts to bring the submission within the theory of law which we have approved herein.

Instruction No. 4 is the plaintiffs' damage instruction and is a modification of MAI 4.07. It reads:

"If your verdict is in favor of Plaintiffs then you must award him (sic) the reasonable value of the services furnished."

This is MAI 4.07 except that the words "with 6% interest thereon from _____, 19__" after the word "furnished" are omitted. (Appellant in his Points and Authorities V, incorrectly attributes the source of this instruction as MAI 7.07 or MAI 7.04).

His principal objection to the giving of this instruction is that it was a modification of MAI 4.07 and this fact was not noted on the copies as required by Rule 70.01, V.A.M.R.

It is true that Rule 70.01(d) requires all *copies* of instructions to be marked as to the MAI source or that it is an MAI modified, or that it is not in MAI. The original need not and should not be so marked since these are taken to the jury room and such markings would tend to confuse and would be of no help to the jury. It would seem apparent that such markings serve an initial purpose of information to the court and counsel for use in settling the instructions. Also, the ultimate purpose of making such MAI markings is so that the information becomes a part of the record in the case for after trial or appellate use.

All of the mandatory requirements of Rule 70.01 must be followed and Rule 70.01(c) provides that "The giving of an instruction in violation of the provisions of this rule shall constitute error, its prejudicial effect to be judicially determined". Buffington v. Fairground Sales Co., 402 S.W.2d 59 (Mo.App.1966). The *copies* of Instruction No. 4 should have been marked as "MAI 4.07—Modified". Was the failure to do so prejudicial to the defendant? The trial court commented that the court and counsel had conferred at length while settling the instructions and knew the source of each, and refused to grant a new trial for this error. We believe this to be a proper determination of the lack of prejudicial effect resulting from this failure. We would add that we cannot see how defendant could possibly be prejudiced by the plaintiffs' failure to seek interest on their bill.

The final asserted error deals with Instruction No. 1 (MAI 2.01—Cautionary Instruction for all Cases) given to the jury at the commencement of the trial.

No objection is made as to the *content* of this instruction. Indeed, it follows MAI 2.01 verbatim. Error is based upon the claim that it is not properly spaced or set up from a printing or typing standpoint, thus giving undue prominence to some parts and relegating other parts to obscurity. We find no merit in this contention.

For the reasons herein stated, the judgment is affirmed.

All concur.